**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **BANKERS LIFE AND CASUALTY COMPANY,** | |
| **Plaintiff,** | |
| **v.** | **NO.** |
| **SACHIN PATEL and RONALD MCELROY,** | |
| **Defendants.** | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Bankers Life and Casualty Company ("Bankers Life" or "Plaintiff") files this Complaint against Sachin Patel ("Patel") and Ronald McElroy ("McElroy") (collectively, "Defendants"). In support thereof, Bankers Life states as follows:

**BACKGROUND ALLEGATIONS**

1.  Bankers Life is engaged in the business of providing seniors with various insurance and financial products, such as long-term care insurance, life annuities, and Medicare Supplement insurance.

2.  In furtherance of its business, Bankers Life utilizes both employees and agents (*i.e.*, independent contractors) to provide insurance and financial products to its customers/policyholders. By meeting face-to-face with customers, learning detailed information about them, and addressing their insurance needs, Bankers Life's employees and agents develop, maintain, and advance the relationship between Bankers Life and its customers. It takes years to develop these customer relationships, which are characterized by low turnover and long-term stability, consistent with the nature of the products at issue – long-term care insurance and life

annuities. Approximately 90% of Bankers Life's policyholders renew their policies in a given year with Bankers Life, and the business relationship between Bankers Life and its policyholders, on average, lasts approximately nine years. As such, Bankers Life invests substantial time and resources in obtaining and developing these customer relationships. Defendants would not have had these customer relationships but for their association with Bankers Life.

3.     Bankers Life requires its agents and employees to sign contracts containing certain restrictive covenants. In consideration of signing these contracts, Bankers Life provides its agents and employees with the agency relationship/employment, specialized training, and access to Bankers Life's confidential and trade secret information.

4.     In or around December 2009, Bankers Life appointed Patel as an agent in Bankers Life's Sacramento-area branch office, located in Roseville, California (the "Sacramento Branch"), at which time Patel signed an Agent Contract.

5.     Bankers Life promoted Patel to a Unit Sales Manager position in November 2011. Unit Sales Managers report to the Branch Sales Manager and are responsible for functions such as achieving sales goals and the recruitment and development of agents.

6.     Bankers Life requires Unit Sales Managers to sign a contract. Patel signed his Unit Sales Manager Contract on November 10, 2011, a true and correct copy of which is attached hereto as **Exhibit A**.

7.     In or around late 2011 or early 2012, Bankers Life appointed McElroy as an agent in Bankers Life's Sacramento Branch, and in return, required that he sign an Agent Contract. McElroy signed his Agent Contract on September 28, 2011, a true and correct copy of which is attached hereto as **Exhibit B**.

8.      Bankers Life promoted McElroy to a Unit Field Trainer position in January 2011. Unit Field Trainers report to the Branch Sales Manager and/or Unit Sales Manager and are responsible for recruiting, training and mentoring agents, as well as maintaining personal production levels.

9.      Bankers Life requires Unit Field Trainers to sign a contract.  McElroy signed his Unit Field Trainer Contract on January 22, 2014, a true and correct copy of which is attached hereto as **Exhibit C**.

10.      Defendants most recently reported to Sacramento Branch Sales Manager Yacoub Fakhouri, who in turn reports to Regional Director Charles Triana, who is located in Chicago, Illinois.

11.      Defendants' Unit Sales Manager, Unit Field Trainer, and Agent Contracts each contain substantively similar, if not identical, restrictive covenants.  These covenants include confidentiality, employee/agent non-solicitation, and customer non-solicitation provisions.

12.      The anti-raiding and customer non-solicitation provisions are quite limited.  First, they apply only to the territory where the individual worked for Bankers Life.  Second, the customer non-solicitation provision does not proscribe all communications with customers or even selling insurance to those customers; rather, the proscription is limited to inducing cancellation or replacement of existing policies with Bankers Life.  Thus, to illustrate, if a customer has a Bankers Life annuity, the individual could sell that customer any other insurance. In fact, the individual even could sell the customer an additional annuity, so long as the customer is not induced to cancel the existing policy.

13.      Defendants have recently breached these important provisions.  Specifically, Patel has solicited Bankers Life agents and managers, including McElroy, to leave Bankers Life.  Patel even began such efforts while he was a Bankers Life employee.  Further, Patel and McElroy

have both aggressively targeted and solicited Bankers Life policyholders for the purpose of inducing such policyholders to cancel their Bankers Life policies and purchase new policies from competitors of Bankers Life. In preparation for, and while engaging in, this conduct, Defendants have misappropriated and improperly utilized Bankers Life's confidential and trade secret information, including client list reports, client information, and prospecting resources, the very information needed to target particular policyholders and tailor proposals to them.

14.     Unless the relief requested herein is granted by the Court, Defendants will continue this unlawful conduct. Bankers Life therefore seeks preliminary and permanent injunctive relief to protect its valuable customer, employee and agent relationships, confidential/proprietary information and goodwill.

15.     Enforcement of the lawful obligations owed by Defendants to Bankers Life is appropriate and necessary to protect Bankers Life's legitimate business interests, customers, goodwill and confidential/proprietary information.

16.     Bankers Life will suffer irreparable harm for which it cannot be adequately compensated by monetary damages alone if the preliminary and permanent injunctive relief requested herein is not granted.

**PARTIES**

17.     Bankers Life is incorporated in Illinois, its principal place of business is in Illinois, and therefore is a citizen of Illinois. Bankers Life has branch offices throughout the United States, including one located at 1512 Eureka Road, Roseville, CA 95661.

18.     Patel is a citizen of California and, upon information and belief, currently resides at 5089 Arlington Way, El Dorado Hills, CA, 95762.

19.     McElroy is a citizen of California and, upon information and belief, currently resides at 5440 College Oak Drive, Apt. 10, Sacramento, CA 95841.

20.     Defendants began performing services for Bankers Life's Sacramento Branch only after completing an extensive application process, background check, and insurance licensing requirements.

21.     Throughout their employment and agency relationships with Bankers Life, Defendants received specialized training to succeed in their role at Bankers Life and were paid substantial wages and/or commissions for their work.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because (1) Bankers Life seeks injunctive relief and recovery of damages, which together exceed the amount in controversy threshold of $75,000, exclusive of interest and costs, and (2) because this action is between citizens of different states.

23.     Defendants are subject to personal jurisdiction and venue in Illinois as a result of the identical forum selection clause contained in their Unit Sales Manager, Unit Field Trainer, and Agent Contracts, which states, "Venue for any action between the parties arising under this Contract shall be in a court located in Chicago, Cook County, Illinois."  (Ex. A, Ex. B, Ex. C, ¶ 25).  These paragraphs also provide for the application of Illinois law in construing the contracts.

## THE RESTRICTIVE COVENANTS

24.     With respect to confidentiality, Paragraphs 6(c) and 15 of the Agent Contract state, in pertinent part, as follows:

> 6(c). The Agent agrees that any and all "Nonpublic Personal Information" obtained by the Agent on behalf of or from Bankers Life and Casualty . . . shall be used by [him/her] only as necessary to fulfill [his/her] obligations under this Contract . . .
>
> "Nonpublic Personal Information" . . . includes but is not limited to name, address, and financial or health information of a policyholder, insured, applicant, or prospect.
>
> This subsection survives the termination of the Agent Contract.

15. The Company will supply rate information, sales manuals and forms for the solicitation of applications for insurance. The Agent acknowledges that all names, policyholder cards and contact data furnished by the Company is specialized and confidential information not generally known in the industry. The Agent further acknowledges that the identity and insurance needs of the Company's clients are not generally known in the industry and that the Company has a proprietary interest in the identity of the Company's customers and customer list. Agent agrees to hold all names, policyholder cards, contact data and customer list in a fiduciary capacity and agrees not to divulge the names, policyholder cards or other contact data to any other Company, agency or person. The Agent agrees to return all rate information, sales manuals, forms, policyholder cards, contact data, and customer lists to the Company upon demand or upon termination as provided in paragraph 22 thereof [which states that "[u]pon termination of this contract, the Agent will promptly return to the Company any and all literature, forms, manuals, supplies, lists, contact data, policyholder lists and other written or printed information in any way pertaining to the business of the Company."]

In the event of breach or threatened breach of this section, the Agent agrees that the Company shall be entitled to seek all appropriate remedies, including without limitation, injunctive relief and monetary damages.

25.     Similarly, with respect to confidentiality, Paragraphs 10, 20(c) and 22 of the Unit

Sales Manager Contract and Unit Field Trainer Contract provide in pertinent part as follows:

## 10.     BOOKS RECORDS, DATA AND AUDIT

(a)     The [Unit Sales Manager/Unit Field Trainer] agrees that all books and records of every kind pertaining to the business of the Company and the branch sales office belong to and are at all times the sole property of the Company. The [Unit Sales Manager/Unit Field Trainer] will keep the books and records in the branch sales office, and will keep detailed and accurate records of all transactions as required by law or by Company rules for and on account of the Company and will hold all of the books and records in trust for the Company and will turn over the books and records intact to the Company on demand or at termination of the employment created by this Contract. During the term of this Contract, the [Unit Sales Manager/Unit Field Trainer] will hold the books and records available at all times for examination by the Company.

(b)     The [Unit Sales Manager/Unit Field Trainer] assumes full

responsibility for the security and processing of all contact data in possession of the [Unit Sales Manager/Unit Field Trainer], recognizing that all such contact data is the Company's property held in a fiduciary capacity.

### 20.    TERMINATION

(c)    Upon termination of this Contract, the [Unit Sales Manager/Unit Field Trainer] will promptly return to the Company all literature, forms, manuals, supplies, customer lists, contact data and other written or printed information in any way pertaining to the business of the Company whether furnished by the Company or purchased by the [Unit Sales Manager/Unit Field Trainer].

### 22.    CONFIDENTIAL INFORMATION

The [Unit Sales Manager/Unit Field Trainer] acknowledges that confidential information of the Company disclosed to the [Unit Sales Manager/Unit Field Trainer] during the term of this Contract is of a special and unique nature and value.   The [Unit Sales Manager/Unit Field Trainer] agrees that any time during, except in the reasonable performance of duties under this Contract, or following the term of this contract, confidential information obtained by the [Unit Sales Manager/Unit Field Trainer] will not be, directly or indirectly, divulged or disclosed for any purpose whatsoever, if such confidential information was obtained by or disclosed to the [Unit Sales Manager/Unit Field Trainer] by the Company.   In the event of breach or threatened breach of this paragraph, the [Unit Sales Manager/Unit Field Trainer] agrees that the Company shall be entitled to seek all appropriate remedies, including without limitation, injunctive relief and monetary damages.

26.    The Agent Contract, Unit Sales Manager Contract and Unit Field Trainer Contract also all contain nearly identical employee/agent anti-raiding and customer non-solicitation provisions.

27.    Specifically, Paragraph 24 of the Agent Contract provides that:

During the term of this Contract and for 24 months thereafter, within the territory regularly serviced by the branch sales office of the Company where the Agent normally submits business, the Agent shall not, personally or through the efforts of others, induce or attempt to induce:

(a) any agent, Branch Sales Manager, Territory Vice President, employee, consultant or other similar representative of the Company to curtail, resign or sever a relationship with the Company.

(b) any agent, Branch Sales Manager, Territory Vice President or employee of the Company to contract with or sell insurance business with any company not affiliated with the Company, or

(c) any policyholder of the Company to relinquish, surrender, replace, or lapse any policy issued by the Company.

In the event of breach or threatened breach of any of these covenants, the Agent agrees that the Company shall be entitled to seek all appropriate remedies, including without limitations, injunctive relief and monetary damages.

28.     Similarly, Paragraph 21 of the Unit Sales Manager Contract provides that:

During the term of this Contract and for 24 months thereafter, within the territory regularly serviced by the Unit Sales Manager's branch sales office, the Unit Sales Manager shall not, personally or through the efforts of others, induce or attempt to induce:

(a) Any agent, Unit or Branch Sales Manager, Territory Vice President, employee, consultant or other similar representative of the Company to curtail, resign or sever a relationship with the Company,

(b) Any agent, Unit or Branch Sales Manager, Territory Vice President or employee of the Company to contract with or sell insurance business with any company not affiliated with the Company, or

(c) Any policyholder of the Company to relinquish, surrender, replace, or lapse any policy issued by the Company.

In the event of breach or threatened breach of any of these covenants, the Unit Sales Manager agrees that the Company shall be entitled to seek all appropriate remedies, including without limitation, injunctive relief and monetary damages.

29.     Finally, Paragraph 21 of the Unit Field Trainer Contract provides that:

- 8 -

During the term of this Contract and for 24 months thereafter, within the territory regularly serviced by the Unit Field Trainer's branch sales office, the Unit Field Trainer shall not, personally or through the efforts of others request, advise, consult, influence, induce or attempt to induce:

(a) Any agent, Unit Field Trainer, Unit Supervisor, Unit Sales Manager or Branch Sales Manager, Territory Vice President, employee, consultant or other similar representative of the Company to curtail, resign or sever a relationship with the Company,

(b) Any agent, Unit Field Trainer, Unit Supervisor, Unit Sales Manager or Branch Sales Manager, Territory Vice President or employee of the Company to contract with or sell insurance business with any company not affiliated with the Company, or

(c) Any policyholder of the Company to relinquish, surrender, replace, or lapse any policy issued by the Company.

In the event of breach or threatened breach of any of these covenants, the Unit Field Trainer agrees that the Company shall be entitled to seek all appropriate remedies, including without limitation, injunctive relief and monetary damages.

30. The restricted territory (as set forth in paragraphs 21 and 24 of Defendants' contracts) is comprised of the following counties in California: Sacramento, Napa, Marin, Lake, Mendocino, Sonoma, Placer, Yolo, El Dorado, Sutter, Yuba, Nevada, Colusa, and Plumas.

## DEFENDANTS' ACCESS TO CONFIDENTIAL INFORMATION/TRADE SECRETS

31. With their executed contracts in place and during Defendants' association with Bankers Life, Bankers Life gave Defendants access to the significant confidential and trade secret information described in those contracts – namely, confidential rate information, sales manuals, customer lists, policyholder cards (which contain information about the policyholder), and contact data. By having access to the policyholder information and policyholder contact data, in particular, Defendants became privy to confidential and trade secret policyholder

information including, without limitation, the policyholders' names, addresses, contact information, dates of birth, social security numbers, the policies each policyholder has with Bankers Life, the coverage provided by those policies, and the premiums paid by the policyholders. In addition, in taking applications, processing renewals, and otherwise working with the policyholders, Defendants obtained additional confidential information including their net worth, information on policies/investments with other companies, comments made by the policyholder such as expressions of goals and priorities, and other personal information about the policyholder that is useful in building a connection with the policyholder and evaluating his or her needs.

32. Bankers Life insisted upon Defendants' agreement to the contracts described in this Complaint as a precondition to giving Defendants access to the confidential information described above. The provision of such information benefitted Defendants.

33. The confidential nature of the information obtained by Defendants cannot be disputed. Policyholder cards and policyholder contact data contain confidential information protected by the Health Insurance Portability and Accountability Act ("HIPAA"). Consistent with its obligations under HIPAA, Bankers Life implements various security measures to maintain the confidentiality of protected information. For example, Defendants were required to complete an online course regarding their responsibility for enhanced privacy of information covered by HIPAA following the passage of the Health Information Technology for Economic and Clinical Health Act.

34. While performing services for Bankers Life, Defendants utilized all of the confidential and trade secret information described above in identifying Bankers Life's current and prospective customers, interfacing with them, and selling them various insurance and financial products. Indeed, Defendants could not have performed any of this work on behalf of

Bankers Life without such information, and Defendants would not have learned or otherwise had access to such information but for their association with Bankers Life. Such information is valuable and has been acquired through the expenditure of resources.

35. By signing their respective contracts with Bankers Life, Defendants acknowledged the confidential and trade secret nature of the information described above and agreed not to misappropriate such information in any way. (*See* Ex. A, ¶¶ 10, 20(c) and 22; Ex. B, ¶¶ 6(c), 15; Ex. C, ¶¶ 10, 20(c) and 22). In addition to the contractual protections with its agents, Unit Sales Managers and Unit Field Trainers, Bankers Life took, and still takes, additional measures to guard against the unauthorized disclosure of its confidential and trade secret information. For instance, all policyholder cards, policyholder contact information, and the like are stored in password-protected computer databases.

## DEFENDANTS' BREACHES OF CONTRACT AND IMPROPER ACTIVITY

36. On or about March 15, 2014, Bankers Life terminated Patel's Unit Sales Manager contract and employment for cause.

37. Immediately thereafter, Patel began soliciting the Bankers Life agents and managers at the Sacramento Branch for the purpose of inducing them to leave Bankers Life and join Patel at his new agency, Capitol Direct.

38. Specifically, on or about March 21, 2014, Patel had a meeting at a coffee shop with Bankers Life Sacramento Branch agents and managers McElroy, Tekoa Loy, Kristina Kusuma, Kevin Tippit, and Jonathon Marcano. At this meeting, Patel solicited these individuals to leave Bankers Life, telling them that he had job opportunities that were better than what Bankers Life had to offer. Patel discussed putting these individuals in touch with Chris Braun, a former Bankers Life manager who now is a high level manager at Capitol Direct.

39.     Mr. Marcano, who did not wish to leave Bankers Life, provided a statement regarding this meeting to the Branch Sales Manager of the Sacramento Branch, Yacoub Fakhouri.

40.     Mr. Fakhouri also received a statement from Sacramento Branch agent Virgil Greer. Mr. Greer stated that in early March, <u>before</u> his termination, Patel asked Greer if Greer would join him if Patel left Bankers Life. Patel also stated to Greer that Patel was going to take policyholder lead information and use that information in his new business.

41.     After the March coffee shop meeting with Patel, Mr. McElroy, Ms. Loy and Ms. Kusuma all ended their relationships with Bankers Life to join Patel at Capitol Direct. This was a direct result of Patel's solicitation of these agents and managers, in violation of his contract.

42.     During this time, Patel also began to solicit Bankers Life's policyholders.

43.     For example, on or about April 10, 2014, Bankers Life received information that Patel had contacted a beneficiary (Bryan Bodt) of one of Bankers Life's deceased annuity policyholders (Lavonne Santos), collected death certificates and other information from him, and asked Mr. Bodt if he knew what he was going to do with the money from the death benefit. Patel had no legitimate business reason to contact this individual, as he was no longer with Bankers Life.

44.     After receiving information about these breaches of contract, Bankers Life checked Patel's activity on Bankers Life's Sales Productivity Network ("BSPN"). Running certain queries and exporting/downloading reports from BSPN allows agents to view and print contact information, policy information, and other details regarding Bankers Life policyholders. The BSPN report showed that in the days and weeks leading up to his termination, Patel had run queries and downloaded thousands of policyholder data records.

45.     On April 23, 2014, counsel for Bankers Life sent Patel a letter informing him of these breaches and requesting that Patel confirm in writing that he would cease and desist from violating the terms of his contract, including but not limited to soliciting Bankers Life agents and policyholders and using Bankers Life's confidential information.  The letter also requested that Patel return all of Bankers Life's confidential information, including the policyholder data that he downloaded before his departure.

46.     Similarly, after resigning from Bankers Life to join Patel at Capitol Direct, McElroy also began to breach his contractual obligations.  For example, on April 7, 2014, McElroy solicited Bankers Life policyholder Debra Scoggins, attempting to replace her Bankers Life insurance policy with a policy through Capitol Direct.

47.     After his resignation, Bankers Life checked McElroy's BSPN activity.  The BSPN report showed that in the days leading up to his resignation, McElroy had run queries and downloaded hundreds of policyholder data records.  McElroy failed to return this information at the time of his resignation.

48.     On April 9 and April 24, 2014, counsel for Bankers Life sent letters to McElroy demanding that McElroy return the policyholder data that he downloaded shortly before his departure, as well as any other Bankers Life confidential information.  On June 13, 2014, counsel for Bankers Life also sent a letter to McElroy requesting that McElroy cease and  desist from violating the terms of his contract, including but not limited to soliciting Bankers Life policyholders.

49.     On or about April 28, 2014, Patel, McElroy and Ms. Kusuma belatedly returned certain items to the Sacramento Branch.  However, Patel failed to return the information that he had downloaded as well as other policyholder information.

50.     Further, both Patel and McElroy have failed to turn in their Garmin GPS devices so that lead information may be removed.  By way of explanation, Bankers Life places customer lead information into Garmin GPS devices used by its agents and managers.  Bankers Life then deletes this information from the Garmin GPS device when an individual terminates their relationship with the company.  However, Patel and McElroy have not turned in their Garmin devices and maintain this lead information, which rightfully belongs to Bankers Life.

51.     Despite being reminded of their contractual obligations, Patel and McElroy continued their aggressive campaign of soliciting Bankers Life's policyholders.

52.     On April 25, 2014, McElroy solicited Bankers Life policyholders Maria and Arturo Jimenez, attempting to replace their Bankers Life insurance policies with policies sold through Capitol Direct.

53.     On or about June 9, 2014, McElroy solicited Bankers Life policyholder Chami Bozorg and induced her to replace her Bankers Life policy and purchase a policy through Capitol Direct.  As a direct result of McElroy's inducement, Ms. Bozorg cancelled her policy with Bankers Life.

54.     On or about June 24, 2014, Patel solicited Bankers Life policyholder Carnetta Spruill, attempting to replace her Bankers Life policy with a policy sold through Capitol Direct.

55.     On or about June 26, 2014, McElroy solicited Bankers Life policyholder Margaret Bergmanis, attempting to replace her Bankers Life policy with a policy sold through Capitol Direct.

56.     While these improper solicitations appeared to die down for several months, Defendants' breaches of their contracts have intensified in recent weeks.

57.     On or about October 9, 2014, McElroy and Patel solicited Bankers Life policyholder Linda Barkhurst to induce her to cancel her Bankers Life insurance policy and

purchase a policy through Capitol Direct. As a direct result of Defendants' inducement, Ms. Barkhurst cancelled her Medicare supplement policy with Bankers Life.

58.     On or about October 27, 2014, Patel and McElroy solicited Bankers Life policyholder Connie Chambers to induce her to cancel her Bankers Life policies and purchase policies through Capitol Direct. As a direct result of Defendants' inducement, Ms. Chambers cancelled her short term care policy and annuity with Bankers Life.

59.     On or about November 4, 2014, Patel visited Bankers Life policyholder Leon Ball and Mr. Ball's home. Patel misrepresented himself as a Bankers Life agent, but then attempted to induce Mr. Ball to replace his Bankers Life insurance policy with a policy through Capitol Direct.

60.     On or about November 14, 2014, Patel visited Bankers Life policyholder Victor Gulickson at Mr. Gulickson's home. Patel misrepresented himself during this visit as a Bankers Life agent and solicited Mr. Gulickson to replace his Bankers Life insurance policy.

61.     On or about December 1, 2014, Patel and McElroy visited Bankers Life policyholder Ricardo Juarez at Mr. Juarez's home. Patel and McElroy misrepresented themselves as Bankers Life agents, but then attempted to replace Mr. Juarez's Bankers Life policy with a policy through Capitol Direct.

62.     On or about December 1, 2014, Patel and McElroy visited Bankers Life policyholders Virginia and Kenneth Bauguess at their home. Patel and McElroy misrepresented themselves as Bankers Life agents, and it was not until after they had written new policies to replace the Bankers Life policies held by Mr. and Mrs. Baugess that they informed them that they were now with a different company, Capitol Direct. As a direct result of Defendants' inducement, Mr. and Mrs. Baugess cancelled their short term care and life insurance policies with Bankers Life.

63.     On or about December 2, 2014, Patel contacted Bankers Life policyholder Wilma Chandler and attempted to set up a meeting with her to review her Bankers Life policies and potential replacement policies.

64.     On or about December 2, 2014, Patel and McElroy solicited Bankers Life policyholders Dianna and James Haaland to try and get them to replace their Bankers Life policies.

65.     In some or all of the above-listed instances of solicitation and inducement of Bankers Life policyholders to cancel their Bankers Life policies, Defendants misrepresented themselves as still being representatives of Bankers Life, and made knowingly false or misleading statements or material omissions to the policyholders, including without limitation, false statements about Bankers Life's financial solvency and false statements and material omissions about the financial consequences to the policyholder of cancelling the policies at issue.

66.     Several of the policyholders contacted and solicited by Defendants have expressed concern to Bankers Life that their personal information is available to and being used by Defendants, who are no longer with Bankers Life.   This has damaged Bankers Life's customer relationships and goodwill.

67.     Defendants would not have had customer relationships with the policyholders discussed above but for their association with Bankers Life.   Solely on account of their association with Bankers Life did Defendants learn of these policyholders' contact information and the information pertaining to their respective Bankers Life policies (*e.g.*, type of policy, premium amount, etc.).   Defendants used this information to locate these policyholders and present them with a comparison between their respective Bankers Life policies and the alternative policies being sold by him.

68.     Due to Defendants' conduct, Bankers Life has suffered damages in an amount to be proven at trial.  Bankers Life has suffered and will continue to suffer damages as a result of the willful and malicious conduct of Defendants.

69.     Due to Defendants' conduct, Bankers Life has suffered and will continue to suffer irreparable harm and lacks an adequate remedy at law.  Defendants' conduct also adversely affects the privacy rights of the policyholders at issue.

70.     The granting of the relief requested herein will not inflict injury upon Defendants, nor will such relief in any way infringe upon or limit the legal rights and privileges of Defendants.  However, the failure to grant such relief will inflict upon Bankers Life continued irreparable harm and injury.

## SPECIFIC CLAIMS

### FIRST CLAIM FOR RELIEF
### (Breach of Contract /Breach of the Confidentiality Provisions)
### (All Defendants)

71.     Paragraphs 1 through 70 of this Complaint are fully incorporated herein by reference.

72.     Bankers Life entered into valid and enforceable contracts with Defendants.

73.     Bankers Life offered the terms of the contracts to Defendants, and Defendants accepted such terms.

74.     Defendants received consideration for signing and entering into the contracts.

75.     In their contracts, Defendants specifically warranted and agreed that they would not disclose to any person or use for their own purposes any of Bankers Life's confidential and trade secret information, including, without limitation, Bankers Life's policyholder cards and policyholders' contact data.  In their contracts, Defendants also warranted and agreed that they would return all of Bankers Life's documents and other property.

76.     Defendants have breached their respective contracts.

77.     Without any authorization from Bankers Life, Defendants have used and/or disclosed Bankers Life's confidential and trade secret information.

78.     Bankers Life has performed each and every obligation required of it under the Defendants' respective contracts.

79.     Bankers Life has suffered actual damages as a result of Defendants' breaches of the confidentiality provisions of their contracts.

80.     Bankers Life has suffered and will continue to suffer irreparable harm as a direct result of Defendants' breaches of their non-disclosure obligations until such time as they are ordered to cease using Bankers Life's confidential, trade secret, and proprietary information.

81.     Injunctive relief is necessary as the recovery of money damages alone would not fully compensate Bankers Life for Defendants' breach of their non-disclosure obligations.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract /Breach of the Anti-Raiding and**
**Customer Non-Solicitation Provisions)**
**(All Defendants)**

82.     Paragraphs 1 through 81 of this Complaint are fully incorporated herein by reference.

83.     In consideration of becoming Bankers Life agents and managers, Defendants specifically agreed in their contracts that they would not induce or attempt to induce: (1) any Bankers Life agent or employee to sever their relationship with Bankers Life or sell insurance with a different company; or (2) any Bankers Life policyholder to relinquish, surrender, replace, or lapse any policy issued by Bankers Life.

84.     These anti-raiding and customer non-solicitation provisions are reasonably necessary to protect legitimate business interests of Bankers Life, namely its agent and employee

relationships, near-permanent customer relationships, Bankers Life's confidential and trade secret information, and Bankers Life's good will.

85.     The anti-raiding and customer non-solicitation provisions are reasonable as to scope in time and territory.

86.     Patel has breached the anti-raiding provision in his contract by inducing Bankers Life's agents and employees to leave Bankers Life. Patel and McElroy have both breached and are continuing to breach the non-solicitation provisions contained in their contracts by inducing Bankers Life policyholders to relinquish, surrender, replace, or lapse policies issued by Bankers Life.

87.     Bankers Life has suffered actual damages as a result of Defendants' breaches of the anti-raiding and customer non-solicitation provisions of their contracts.

88.     Bankers Life has suffered and will continue to suffer irreparable harm as a direct result of Defendants' breaches of their anti-raiding and non-solicitation obligations until such time as they are ordered to cease soliciting Bankers Life's agents, employees and policyholders.

89.     Injunctive relief is necessary as the recovery of money damages alone would not fully compensate Bankers Life for Defendants' breaches of their anti-raiding and customer non-solicitation obligations.

### THIRD CLAIM FOR RELIEF
**(Misappropriation of Trade Secrets)**
**(All Defendants)**

90.     Paragraphs 1 through 89 of this Complaint are fully incorporated herein by reference.

91.     By virtue of being a former Bankers Life agents and managers, Defendants have in their possession Bankers Life's confidential and trade secret information. Further, Patel specifically downloaded thousands of policyholder data records prior to his termination.

- 19 -

Unauthorized disclosure and misappropriation of such information poses a significant threat to Bankers Life's ongoing business.

92.     Bankers Life's confidential and trade secret information constitutes trade secrets because Bankers Life derives independent economic value from that information, such information is neither generally known nor readily accessible by proper means by other persons who can obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.  Thus, Bankers Life's confidential and trade secret information described herein constitutes "trade secrets" within the meaning of the Illinois Trade Secrets Act, 765 ILCS § 1065 *et seq*. and the California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426- 3426.11.

93.     Defendants have misappropriated Bankers Life's confidential and trade secret information to target policyholders, tailor proposals to specific insurance products and premium costs, and solicit these policyholders away from Bankers Life.

94.     These actions by Defendants are in violation of the Illinois Trade Secrets Act and the California Uniform Trade Secrets Act.

95.     Defendants will be unjustly enriched by the misappropriation of Bankers Life's confidential and trade secret information and, unless restrained, will continue to use, divulge, and/or otherwise misappropriate Bankers Life's confidential and trade secret information.

96.     Defendants' wrongful conduct will persist unless enjoined by this Court.

97.     Bankers Life has suffered actual damages as a result of Defendants' misappropriation of Bankers Life's confidential and trade secret information.

98.     As a result of the misappropriation of Bankers Life's confidential and trade secret information, Bankers Life has been injured and faces irreparable injury.  Bankers Life is

threatened with losing its competitive advantage, its confidential and trade secret information, and goodwill in amounts which may be extremely difficult, if not impossible, to fully determine.

### FOURTH CLAIM FOR RELIEF
**(Conversion)**
**(All Defendants)**

99.     Paragraphs 1 through 98 of this Complaint are fully incorporated herein by reference.

100.    Bankers Life has the absolute and unconditional right to its documents containing Bankers Life's confidential and trade secret information and the immediate possession of such property.

101.    Pursuant to their contracts, Defendants agreed to return all of Bankers Life's documents, including, without limitation, documents containing Bankers Life's confidential and trade secret information.

102.    Defendants have retained Bankers Life's property for their own use and with the intent to permanently deprive Bankers Life of that property.

103.    Defendants, without the authorization of Bankers Life, wrongfully assumed control, dominion, and/or ownership over Bankers Life's property.

104.    Bankers Life has suffered actual damages as a result of Defendants' acts of conversion.

105.    Bankers Life has suffered and will continue to suffer irreparable harm as a direct result of Defendants' acts of conversion.

106.    Injunctive relief is necessary as the recovery of money damages alone would not fully compensate Bankers Life for Defendants' acts of conversion.

107.    Defendants' conduct as alleged herein was willful and malicious and entitles Bankers Life to recover punitive damages.

## FIFTH CLAIM FOR RELIEF
### (Tortious Interference With Contract)
### (Patel)

108.    Paragraphs 1 through 107 of this Complaint are fully incorporated herein by reference.

109.    Patel was fully aware that the Bankers Life agents and managers he solicited and attempted to solicit away from Bankers Life were bound by Agent Contracts and Unit Field Trainer Contracts.

110.    Bankers Life's Agent Contracts and Unit Field Trainer Contracts create a valid and enforceable contractual relationship.

111.    Bankers Life has a reasonable expectation that its agents and managers will remain with Bankers Life, and Patel was aware of this expectation.

112.    By intentionally soliciting Bankers Life agents and managers to leave Bankers Life, Patel wrongfully interfered with Bankers Life's Agent Contracts and Unit Field Trainer Contracts and has caused breaches of those contracts.

113.    As a result of Patel's solicitation efforts, several Bankers Life agents and managers have severed their relationships with Bankers Life.

114.    Also as a result of Patel's solicitation efforts, McElroy violated his contract by soliciting Bankers Life's policyholders.

115.    Patel's conduct as described above was without justification.

116.    Patel's conduct as described above has damaged Bankers Life in an amount to be proven at trial.

117.    Bankers Life has suffered and will continue to suffer irreparable harm as a direct result of Patel's acts of tortious interference.

118.    Injunctive relief is necessary as the recovery of money damages alone would not fully compensate Bankers Life for Patel's acts of tortious interference.

119.    Patel's conduct as alleged above is willful and malicious and entitles Bankers Life to recover punitive damages.

## SIXTH CLAIM FOR RELIEF
**(Tortious Interference With Prospective Advantage)**
**(All Defendants)**

120.    Paragraphs 1 through 119 of this Complaint are fully incorporated herein by reference.

121.    Bankers Life has achieved a stable business relationship with its policyholders.

122.    Defendants were and still are aware of the stable business relationships Bankers Life has with its policyholders in the counties of Sacramento, Napa, Marin, Lake, Mendocino, Sonoma, Placer, Yolo, El Dorado, Sutter, Yuba, Nevada, Colusa, and Plumas, as delineated in Paragraph 30 above.

123.    Bankers Life has or had valid insurance contracts with its policyholders and expects/expected these contracts and business relationships to continue.  Defendants were aware of Bankers Life's expectation in this regard.

124.    With this knowledge, Defendants have intentionally and wrongfully solicited Bankers Life policyholders for the purpose of having them curtail, resign, or sever their relationship with Bankers Life.

125.    Similarly, Defendants' conduct was intentionally done to induce or attempt to induce policyholders to relinquish, surrender, replace, or lapse their respective policies with Bankers Life and replace it with an alternative policy sold by Defendants.

126.    Bankers Life has had its policyholders cancel their policies as a result of Defendants' wrongful conduct.

127.    But for Defendants' wrongful conduct, the policyholders solicited by Defendants would not have cancelled their Bankers Life policies.

128.    Defendants' conduct as described above is in violation of their contracts.

129.    Defendants' conduct as described above was without justification.

130.    Defendants' conduct as described above has damaged Bankers Life in an amount to be proven at trial.

131.    Bankers Life has suffered and will continue to suffer irreparable harm as a direct result of Defendants' acts of tortious interference.

132.    Injunctive relief is necessary as the recovery of money damages alone would not fully compensate Bankers Life for Defendants' acts of tortious interference.

133.    Defendants' conduct as alleged above is willful and malicious and entitles Bankers Life to recover punitive damages.

**SEVENTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty)**
**(Patel)**

134.    Paragraphs 1 through 133 of this Complaint are fully incorporate herein by reference.

135.    Bankers Life placed Patel in a high-ranking management position as Unit Sales Manager.  The Unit Sales Manager position is a position of trust and confidence, wherein Patel was responsible for developing and maintaining customer relationships and identifying new business opportunities.  As a manager of Bankers Life, Patel owed Bankers Life a fiduciary duty of loyalty, good faith and fair dealing.

- 24 -

136. Patel violated this duty by downloading confidential and trade secret information of Bankers Life while still employed by Bankers Life and retaining that information after the termination of his employment with Bankers Life in order to compete with Bankers Life.

137. Patel violated this duty by, while still employed by Bankers Life, soliciting and inducing Bankers Life's agents and employees to sever their relationships with Bankers Life and to join Patel at his new company, Capitol Direct.

138. As a consequence of Patel's actions, Bankers Life has suffered harm in the form of lost profits that Bankers Life would have otherwise received and recruitment costs associated with agents and employees previously appointed by Bankers Life.

139. Bankers Life is entitled to monetary damages against Patel in an amount to be determined at trial.

**WHEREFORE**, Bankers Life requests the following relief against Defendants:

(a)     Entry of preliminary and permanent injunctive relief providing specific performance of the terms of Defendants' contracts signed and acknowledged by them;

(b)     Entry of preliminary and permanent injunctive relief prohibiting Defendants from misappropriating Bankers Life's confidential and trade secret information;

(c)     Entry of judgment in favor of Bankers Life and against Defendants for breach of contract, misappropriation of trade secrets, conversion, tortious interference with contract, and tortious interference with prospective economic advantage;

(d)     An award of compensatory damages, double damages for willful misappropriation of trade secrets, punitive damages, costs, attorneys' fees, and any other relief as deemed to be warranted by this Court.

Respectfully submitted,

*/s/ David K. Haase*
David K. Haase

David K. Haase (6201278)
Todd M. Church (6281176)
LITTLER MENDELSON, P.C.
321 N. Clark Street, Suite 1000
Chicago, IL  60654
Tel: 312.372.5520
Fax: 312.372.7880

*Attorneys for Plaintiff*

Dated: December 15, 2014

Firmwide:130454141.2 054835.1421